Ruby Mae DABNEY, Appellant,

v.

Maxine THOMAS et al., Appellees.

No. 8340.

Court of Civil Appeals of Texas, Beaumont.

Jan. 24, 1980.

Rehearing Denied Feb. 14, 1980.

Houston Thompson, Silsbee, for appellant.

Lee Roger Ratliff, Earl B. Stover, Silsbee, for appellees.

KEITH, Justice.

· The proponent of a nuncupative will has appealed from an adverse judgment based upon an instructed verdict at the conclusion of her testimony. Proponent is one of the stepchildren of Pleas ("Pat") King, the deceased. Proponent's mother had died several years earlier survived by several children born of a prior marriage. From our record, we surmise that she died intestate.

Contestants are Maxine Thomas, a granddaughter of Pat King, who appeared individually and as guardian of Willie Lawrence King, a son of King, and Florine Thomas, another granddaughter.

The instrument offered for probate was dated September 27, 1974, and the witnesses testified that it was written upon the date King made the statements attributed to him. At the time the instrument was written, King was in a hospital in Silsbee, Texas, but our record does not disclose when he entered the hospital, what necessitated his hospitalization, the nature of the treatment he received, or the names of the physicians who cared for him. We do know that he died on October 24, 1974. The next day, proponent filed an application to be, and was, appointed temporary administrator of King's estate upon the representation that he died intestate.

The two-page instrument offered for probate on August 3, 1976, was entirely in the handwriting of proponent except for the signatures of the attesting witnesses. We have included a typed copy of such instrument in the appendix so that the complete instrument is made a part of this opinion.

Elizabeth Burton, one of the attesting witnesses, accompanied proponent to the hospital for the purpose of visiting King. There were only three persons in the room when King is alleged to have made the statement concerning his money in the savings and loan and his retirement income: King, proponent, and Burton.

According to Burton, as soon as King had made such statements, proponent left the room in search of witnesses. She returned within a few minutes accompanied by Dorothy Monson and Maggie Miles. Proponent seated herself in a chair near the head of King's bed while the three other women stood around the side or foot of the bed.

Proponent's version of the event was incomplete because contestants invoked the "Dead Man's Statute", *Tex.Rev.Civ.Stat. Ann. art. 3716 (1926)*. And, as might be expected, the versions of the three witnesses to the instrument varied in considerable detail on cross-examination.

Before going into the details of the evidence, it is well to consider the scope of appellate review of an order granting a peremptory instruction. The rule in the *ordinary* case is stated succinctly in *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). A party is entitled to a directed verdict only when reasonable minds can draw only one conclusion from the evidence. Quoting from *Collora* :

"The task of an appellate court in such a case is to determine whether there is any evidence of probative force to raise fact issues on the material questions presented. The court must consider all of the evidence in the light most favorable to the party against whom the verdict was instructed, discarding all contrary evidence and inferences." (citations omitted)

But, "the proof to admit a nuncupative will to probate must be of the clearest

and most convincing character." *Hargis v. Nance*, 159 Tex. 263, 317 S.W.2d 922, 926 (1958). In such cases proof must be made by the testimony of three credible witnesses. *Tex.Prob.Code Ann. § 86(c) (1956)*; and, the testimony of the three witnesses must be in substantial agreement. *Hargis v. Nance*, supra. It is at this point where the standards for the consideration of the sufficiency of the evidence to require submission to the jury takes a new twist in this type of case. In *Hargis v. Nance*, supra, Judge Calvert noted that the instruction given by the trial court left it to the jury to determine whether the testimony of the three witnesses was in substantial agreement. He continued:

"That question is one for determination by the judge, as evidently the trial judge in this case realized when he rendered judgment notwithstanding the verdict of the jury. It is one which the judge should and normally will decide at the conclusion of the testimony and before any issue is made for jury determination. Unless the judge finds that at least three witnesses substantially agree on the terms of the will, there is no will, and there is nothing to submit to a jury. Neither is there a jury issue as to the terms of the will if only three witnesses purport to testify thereto and their testimony is in substantial agreement."

See also *9 Texas Practice, Wills § 367, at 558 (Bailey, 1968)*.

Proponent relies almost exclusively upon language found in *Connor v. Purcell*, 360 S.W.2d 438 (Tex.Civ.App.—Eastland 1962, writ ref'd n. r. e.), where a nuncupative codicil was admitted to probate in the district court and the action was affirmed. This case has been criticized by the scholars' and, indeed, seems to be an aberration.[1] See *Hunt v. White*, 24 Tex. 643, 653 (1860), where it was held, unequivocally, that there cannot be both a written and a nuncupative will, one which is partly written and partly oral. "It is one or the other; it cannot be both."

Moreover, we note that the nuncupative will in *Connor* was declared at 2:40 in the afternoon shortly after the testator had been injured in an accident and taken to the hospital. He died before midnight the same day. (360 S.W.2d at 440–441) As noted earlier, we do not know why King was in the hospital, but we do know that he lived for several weeks thereafter.

We have given careful consideration to the question of the quantum of proof required to establish a submittable case involving a nuncupative will; we have concluded that such case is governed by the rule enunciated in *Hargis v. Nance*, supra (317 S.W.2d at 926), and that the usual rule epitomized by *Collora*, supra (574 S.W.2d at 68), is inapplicable. It is for the trial court to first determine, as a question of law, whether the three witnesses agreed "substantially" on the terms of the will.

We must also bear in mind other teachings of our Supreme Court, a few of which are summarized:

1. "[T]he proof to admit a nuncupative will to probate must be of the clearest and most convincing character." *Hargis v. Nance*, supra (317 S.W.2d at 926).

2. "Nuncupative wills are not favorites of the law. . . . They are hedged round with numerous restrictions, to guard against the frauds for which oral wills offer so many facilities; and . . . strict proof is required of all the requisites prescribed by the law." *Mitchell v. Vickers*, 20 Tex. 377, 384 (1857).

3. "Wills of this kind, by the law, are allowed to exist, on its bare toleration, and under the shadow of its jealousy; and, the establishment of them is allowed, subject to exacting restrictions and conditions which correspond in degree with its fears of their dangerous qualities." *Watts v. Holland*, 56 Tex. 54, 63 (1881).

■ We now turn to an analysis of the testimony of the three witnesses to the

1. See, e. g., *9 Texas Practice, Wills*, supra, *§ 364, at 553 554*; Comments, "The Nuncupative Will", *18 Baylor L.Rev. 77, 90 (1966)*.

alleged will tendered by proponent. Dorothy Monson's testimony was that "he [King] said he wanted her [proponent] to have the money that was in Savings and some kind of retirement money"; that "he was asking that she see after Willie Lawrence or somebody . . . ."

Elizabeth Burton testified as to what was stated in the presence of three witnesses was read to King from the writing prepared by proponent, and that he merely replied "yes" to proponent's question as to whether that was what he wanted. After a careful review of Burton's testimony, we conclude that the statements attributed to the deceased were made in her presence when only proponent, King, and Burton were present, i. e., before it was reduced to writing and read back to King in the presence of Monson and Miles. It is a fair inference that her testimony was to the effect that the "money" was to be left in trust so that proponent could "take care of Willie Lawrence"—a form of precatory wish and not a devise.

Maggie Miles stated that "he wanted Miss Dabney to have *their* mother's money in the Savings, Hardin Savings." As contestants point out, it was only in answer to leading questions did she say anything about the retirement benefits or the taking care of Willie Lawrence.

Having reviewed the evidence under the standards we consider applicable, as aforesaid, we use Chief Justice Hemphill's language to express our conclusion: "There is too much discrepancy and conflict, for the words spoken to be regarded as the last will of the deceased, or sufficient to change the order of descent, and divert the property from the channel marked by the law." *Mitchell v. Vickers*, supra (20 Tex. at 385).

█ There is still another reason advanced by contestants which requires an affirmation of the judgment of the trial court. We have already mentioned the fact that the alleged nuncupative will was proclaimed, according to the proponent, on September 27, 1974, and that King died on

October 24, 1974; thus, he lived twenty-seven days after the publication of the alleged will. Likewise, we have commented upon the lack of record proof showing King's physical condition, the nature of his illness or affliction, etc.

Under this uncertain and silent record, we turn to a consideration of the so-called "extremis rule" as applicable to this type of a will. The authorities were collected and analyzed by Judge Hickman in *McClain v. Adams*, 135 Tex. 627, 146 S.W.2d 373, 374–375 (1941), where he concluded:

"From the foregoing we conclude that early in the jurisprudence of this state the majority rule that the testator must be in extremis was approved by this court." [2]

Judge Hickman discussed the "majority" and "minority" cases involving the "in extremis" doctrine in *McClain*. For a more recent alignment of the cases, see Annotation, "Nuncupative Wills—'Last Sickness' ", *8 A.L.R.3d 952 (1966)*. See also *2 Page on Wills § 20.15, at 303–306 (Bowe-Parker Rev. 1960)*; Comment, *18 Baylor L.Rev.*, supra, at 83.

Under the unsatisfactory record brought to us for review, we are unable to determine that King was in extremis when he made the statements attributed to him. There is no way we can determine in this record the cause of his death.

We have concluded that proponent failed to discharge the onerous burden cast upon her by the decisions of Texas in offering the instrument for probate and record. The trial court did not err in instructing the jury to return a verdict for contestants. *Lewis v. Aylott's Heirs*, 45 Tex. 190, 200 (1876); *McClain v. Adams*, supra; *Hargis v. Nance*, supra.

The judgment of the trial court is AFFIRMED.

### APPENDIX

"Silsbee, Texas
Sept. 27, 1974

"To Whom It May Concern:

---

**2.** *McClain v. Adams* was cited with approval on another point and this holding was not criti-

cized in *Hargis v. Nance*, supra (317 S.W.2d at 926).

I visited my father, Pleas King as I have been doing since his admittance in Silsee's Doctor's Hospital. I greeted him in my usual manner "Hello Daddy Pat, how are you?' 'He said, All right Babe.' Before Mrs. Burton who went with me to see him could speak to him, he began to tell me what he wanted.

He said, 'Babe I did you wrong, that money in Hardin County Savings and Loan belong to your mother. I want to right that wrong because I wont make it this time. I want you to have that money in Hardin County Savings because it is yours. I took it out and put it back in my name. I want you to have that money and also my railroad retirement money. Do you understand?' I said, Yes Sir Daddy Pat. He then said, 'Help see about Willie Lawrence.' I, said, I will daddy Pat. I asked Mrs. Elizabeth Burton did she hear that? She said, 'Yes I did.' I told her let me go get somebody else and ask him to repeat this. She said, all right. I went out and got the following people to come in Daddy Pats room and bare witness to this. They did.

> Respectfully,
>
> /s/ Ruby Dabney
>
> Witnesses
>
> /s/ Elizabeth Burton
> /s/ Maggie Miles
> /s/ Mrs. Dorothy Monson"